IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

JANELLE QUINN, individually    *
and on behalf of her minor     *
child D.J.Q., Jr.,             *
                               *
        Plaintiffs,           *
                               *          CV 122-051
        v.                     *
                               *
COLUMBIA COUNTY SCHOOL         *
DISTRICT,                      *
                               *
        Defendant.            *
                               *

---

**O R D E R**

---

Before the Court is Defendant's motion for summary judgment. (Doc. 30.) For the following reasons, Defendant's motion is **GRANTED**.


**I. BACKGROUND**

The Court sets out the relevant facts below from the filed pleadings and supporting documents.

**A. Procedural History**

On April 27, 2022, Plaintiffs filed their original Complaint under Title VI of the Civil Rights Act of 1964 ("Title VI") asserting that, in violation of this statute, Defendant racially discriminated against D.Q.R., Jr., Plaintiff Janelle Quinn's ("Ms. Quinn") minor son, and then retaliated against Plaintiffs. (Doc.

1, ¶¶ 64-87.)  Defendant moved for summary judgment on May 1, 2023 (Doc. 30), Plaintiffs responded on May 22, 2023 (Doc. 33.), and Defendant replied on June 6, 2023 (Doc. 36).

## B. Undisputed Facts

Ms. Quinn is the mother of D.J.Q., Jr., a student previously enrolled at Parkway Elementary School ("Parkway") for the 2020-21 school year.  (Doc. 30-10, ¶ 1; Doc. 33-1, ¶ 1.)  Ms. Quinn is a Military and Family Life Counselor ("MFLC") employed by Magellan Federal ("Magellan"), who was assigned to Greenbrier Elementary School ("Greenbrier") and Parkway for the 2020-21 school year. (Doc. 30-10, ¶ 2; Doc. 33-1, ¶ 2.)  Defendant is a Georgia school district that manages and controls the schools located within Columbia County, Georgia, including Parkway.  (Doc. 30-10, ¶ 3; Doc. 33-1, ¶ 3.)

### 1. The Incident

On or about January 19, 2021, during lunch, D.J.Q., Jr. sought the attention of Ms. Julie Owens, a counselor at Parkway, to request a different eating utensil.  (Doc. 30-10, ¶ 4; Doc. 33-1, ¶ 4.)  Rather than supplying a different eating utensil, Ms. Owens picked up the eating utensil, placed the utensil in D.J.Q., Jr.'s mouth, removed the utensil, and placed the utensil in D.J.Q., Jr.'s hand.  (Doc. 30-10, ¶ 5; Doc. 33-1, ¶ 5.)  Ms. Owens then moved

away and returned to lunch duties, and D.J.Q., Jr. continued eating his lunch with the utensil. (Doc. 30-10, ¶ 6; Doc. 33-1, ¶ 6.)

### 2. Defendant's Response to the Incident

The next day, January 20, 2021, Ms. Quinn and her husband met with Dr. Doolittle, the principal of Parkway to discuss the incident involving Ms. Owens. (Doc. 30-10, ¶ 7; Doc. 33-1, ¶ 7.) Ms. Quinn and her husband did not mention discrimination or racism at that time. (Doc. 30-10, ¶ 8; Doc. 33-1, ¶ 8.) Dr. Doolittle reported the incident to his supervisor, Dr. Williams. (Doc. 30-10, ¶ 10; Doc. 33-1, ¶ 10.) Dr. Doolittle reviewed video footage of the incident, which was also reviewed by Dr. Williams, former Associate Superintendent, and Dr. Carraway, former Superintendent. (Doc. 30-10, ¶ 11; Doc. 33-1, ¶ 11.) In a letter dated January 24, 2021 and sent to the local board of education, Ms. Quinn complained of the incident but did not allege racial discrimination. (Doc. 30-10, ¶ 13; Doc. 33-1, ¶ 13.)

A second meeting took place on February 24, 2021, between Ms. Quinn, Dr. Doolittle, and Dr. Williams. (Doc. 30-10, ¶ 14; Doc. 33-1, ¶ 14.) At this meeting, Ms. Quinn stated she believed Ms. Owens's action in the lunchroom was an instance of racism. (Doc. 30-10, ¶ 15; Doc. 33-1, ¶ 15; Doc. 33-2, ¶¶ 18-20.) Ms. Quinn further reported the incident to the Professional Standards Commission, Columbia County Sheriff's Office, and the U.S.

Department of Justice, which referred the matter to the Department of Education. (Doc. 30-10, ¶ 15; Doc. 33-1, ¶ 15.)

Ms. Quinn alleges the nature of the act of placing the eating utensil in D.J.Q., Jr.'s mouth is proof of discriminatory intent. (Doc. 30-10, ¶ 16; Doc. 33-1, ¶ 16.) Although Ms. Owens has allegedly made comments in the past referring to a student's "football hairdo" or there being "too many Mexicans in Walmart," Ms. Quinn has no knowledge of Ms. Owens taking any action toward another person based on race or skin color. (Doc. 30-10, ¶ 17; Doc. 33-1, ¶ 17.) Prior to January 19, 2021, Ms. Quinn received no prior complaints from D.J.Q., Jr. regarding Ms. Owens and had no reason to think there was any ill feelings between them. (Doc. 30-10, ¶ 18; Doc. 33-1, ¶ 18.) Although D.J.Q., Jr. is of a young age, he never stated that Ms. Owens's actions were motivated by his race. (Doc. 30-10, ¶ 20; Doc. 33-1, ¶ 20.) In her January 24, 2021 letter to Dr. Carraway, Ms. Quinn did not allege discrimination on the basis of race, but that Ms. Owens violated the student's personal space during the time of the COVID-19 pandemic. (Doc. 30-10, ¶ 20; Doc. 33-1, ¶ 20.)

Although Ms. Quinn is usually in the lunchroom during lunch time because it is "prime time" for her to interact with students, she has no specific recollections of Ms. Owens interacting with any other child in the lunchroom other than the incident involving D.J.Q., Jr. (Doc. 30-10, ¶ 21; Doc. 33-1, ¶ 21.) Ms. Quinn has

4

not witnessed Ms. Owens interact with a student of a different race (or any race) in response to a request for an eating utensil. (Doc. 30-10, ¶ 22; Doc. 33-1, ¶ 22.)  Dr. Doolittle never received any other complaints of discrimination against Ms. Owens and did not think there was a need to discipline Ms. Owens. (Doc. 30-10, ¶¶ 23, 24; Doc. 33-1, ¶¶ 23, 24.)

In response to Ms. Quinn's complaints and requests, efforts were made to prevent contact between D.J.Q., Jr. and Ms. Owens including: changing Ms. Owens's lunch duty schedule; allowing D.J.Q., Jr. to report to the media center when Ms. Owens was needed in D.J.Q., Jr.'s class; and requesting Ms. Owens take efforts to avoid D.J.Q., Jr. during class change and to avoid one-on-one interaction.  (Doc. 30-10, ¶ 12; Doc. 30-4, at 54.)[1]  Except for one incident where Ms. Owens addressed D.J.Q., Jr. by name, there was no further one-on-one contact between Ms. Owens and D.J.Q., Jr. and there was no other negative interaction with Ms. Owens for the rest of the school year.  (Doc. 30-10, ¶ 19; Doc. 30-4, at 41, 82-84.)

---

[1] While Ms. Quinn testified in her deposition that Defendant did not "put anything in place to keep Ms. Owens away from [her] child at the time," she also testified that at the February 24, 2021 meeting she "had put in place . . . no one-on-one with Ms. Owens[, Ms. Owens] would not be in the lunchroom[, and D.J.Q., Jr.] would be pulled from class when she was counseling. . . . [Defendant was] working with me to put the things in place."  (Doc. 30-4, at 11, 54.)  Based on the record, the Court finds it an undisputed fact that Defendant made these remedial efforts at Ms. Quinn's request.

3. Ms. Quinn's Employment Status Following the Complaints

At the time of the incident giving rise to this lawsuit, Ms. Quinn was assigned as an MFLC at two schools operated by Defendant, Greenbrier and Parkway, where she split duties approximately half and half. (Doc. 30-10, ¶ 26; Doc. 33-1, ¶ 26.) Ms. Quinn initiated a criminal prosecution against Ms. Owens by filing a police report with the Columbia County Sheriff's Department on or about April 28, 2021. (Doc. 30-10, ¶ 30; Doc. 33-1, ¶ 30.) Dr. Doolittle reported the matter to Ms. Sherman, the Associate Superintendent replacing Dr. Williams. (Doc. 30-10, ¶ 31; Doc. 33-1, ¶ 31.) Ms. Sherman spoke with Ms. Beth Welch at Magellan to describe the events and to ask how to calm the situation at the school. (Doc. 30-10, ¶ 33; Doc. 33-1, ¶ 33.) As a follow-up to their conversation, Ms. Sherman sent the following message to Ms. Welch via email on April 29, 2021:

> It is unfortunate that we were unable to resolve the issues with Mrs. Quinn. Below is a brief summary of the concerns.
> Mrs. Quinn is a parent and MFLC counselor at [Parkway]. In January, there was an incident in the lunchroom in which the PES counselor responded [to] her son's request for a spoon in a manner that caused the child to be embarrassed. Mrs. Quinn brought this to the attention of the administration and the matter was promptly addressed with the counselor. The counselor immediately apologized to the child, the parents, and offered to apologize to any children who may have heard the interaction. She stated that she had no intention of embarrassing the child and felt terrible that he was

6

embarrassed.  At the time, the principal stated that the
parents seemed satisfied with the response.
Later, the mother contacted Assistant Superintendent Dr.
Deborah Williams who also spoke with the mother and
assured her that the matter was handled appropriately.
Following Mrs. Quinn sent certified letters to each
board member and the school Superintendent Dr. Sandra
Carraway, which prompted another investigation by our
office.  Upon completion of this investigation, which
included a review of video footage, Mrs. Quinn was
notified that no further action with the counselor was
warranted.  This morning the principal notified me that
Mrs. Quinn has filed a police report with the Columbia
County Sheriff's Office.
At this point, the actions of Mrs. Quinn are causing a
disruption to the learning environment at [Parkway].
The school principal has requested that Mrs. Quinn not
return to his school as an MFLC counselor and we support
this request.  We appreciate your help with this matter
and look forward to working with your counselors in our
schools next year.

(Doc. 33-15, at 2.)

Defendant had no complaints about the work performance of Ms.

Quinn and thought highly of her and her services as an MFLC.  (Doc.

30-10, ¶ 35; Doc. 33-1, ¶ 35.)  Magellan does not allow an MFLC to

be assigned to the same school their child or children attend.

(Doc. 30-10, ¶ 36; Doc. 33-1, ¶ 36.)  Magellan believes a conflict

can exist whenever a counselor's objectivity is or could be

perceived as compromising the performance of MFLC services.  (Doc.

30-10, ¶ 37; Doc. 33-1, ¶ 37.)

In the event of a circumstance that could reflect poorly on

the MFLC Program, the matter is reported to the federal government,

and the federal government determines whether remedial action is

appropriate.  (Doc. 30-10, ¶ 38; Doc. 33-1, ¶ 38.)  The federal

government investigated the matter and agreed with Ms. Welch's recommendation that Ms. Quinn complete the rest of the year at Greenbrier, the other school operated by Defendant where she was already assigned. (Doc. 30-10, ¶ 39; Doc. 33-1, ¶ 39.)

From April 29, 2021 through May 3, 2021, Ms. Quinn was told by Magellan not to return to either school until an investigation was completed by the federal government in Washington, D.C. (Doc. 30-10, ¶ 46; Doc. 33-1, ¶ 46.) During that time, Ms. Quinn was paid by Magellan, and she was not charged with paid time off. (Doc. 30-10, ¶ 47; Doc. 33-1, ¶ 47.) After the investigation, Magellan allowed Ms. Quinn to return to Greenbrier for the rest of the school year. (Doc. 30-10, ¶ 48; Doc. 33-1, ¶ 48.) Ms. Welch of Magellan was unaware of any instance of a parent being reassigned at the request of a school because Magellan tries to avoid the presence of a counselor/parent and child in the same school. (Doc. 30-10, ¶ 49; Doc. 33-1, ¶ 49.)

At all relevant times, Ms. Quinn was a Magellan employee. (Doc. 30-10, ¶ 51; Doc. 33-1, ¶ 51.) Ms. Quinn was supervised and paid by Magellan, and her assignments were determined by Magellan. (Doc. 30-10, ¶ 52; Doc. 33-1, ¶ 52.) MFLC installations in local schools are established by the federal government. (Doc. 30-10, ¶ 54; Doc. 33-1, ¶ 54.)

8

## C. Disputed Facts

### 1. Defendant's Version of Facts

Defendant contends Ms. Quinn's only acceptable resolution was to have Ms. Owens's employment terminated, and Defendant did not believe this was appropriate. (Doc. 30-10, ¶ 25.) After the incident, Ms. Quinn became an increasing disruption to the school environment because she would follow D.J.Q., Jr. everywhere, and it caused concern. (Id. ¶ 27.) Ms. Quinn would allegedly stand outside D.J.Q., Jr.'s class, in the halls, in the lunchroom, and in the commons when she was supposed to be counseling students. (Id. ¶¶ 28, 29.)

Ms. Sherman never discussed anything with Magellan other than removing Ms. Quinn from Parkway and for her to remain at Greenbrier, which was 1-2 miles away and where she already served in addition to Parkway. (Id. ¶ 34.) Defendant was not involved in Magellan's counselor assignment decision-making process for the following school year, and Defendant never interceded to prevent Ms. Quinn from working at any other school in the district. (Id. ¶ 43.) Further, Dr. Doolittle never evaluated Ms. Quinn's employment, and he never discussed her behavior or oversaw her work because she was never an employee of Defendant. (Id. ¶ 50.) Defendant has no control over pay, supervision or monitoring of Ms. Quinn's job performance. (Id. ¶ 53.)

Defendant asserts the following concerning Ms. Quinn's employment with Magellan: MFLCs' assignments are meant to be rotational to keep lines from being blurred or prevent people from seeking support; Magellan's desire is for the MFLC to rotate every year and counselors are not automatically reassigned to their current placement; Ms. Quinn did not reveal to Magellan that she had a child in the same school as her assignment, and if Magellan had known, Ms. Quinn would not have been assigned to Parkway. (Id. ¶¶ 55-60.) Based on the alleged policies of Magellan, Defendant asserts whether or not it had asked for Ms. Quinn to be reassigned, upon learning she was assigned to the same school as her child, Magellan would have determined that she must be reassigned. (Id. ¶ 61.)

2. Plaintiffs' Version of Facts

Plaintiffs contend on the day of the incident, Ms. Owens put a dirty utensil in D.J.Q., Jr.'s mouth after he requested a clean utensil, saying "clean that spoon." (Doc. 33-2, ¶ 15.) While Plaintiffs were dissatisfied with Defendant's "anemic" response to Ms. Owens's actions and wished for Ms. Owens to be terminated, Ms. Quinn also requested interventions to eliminate contact with D.J.Q., Jr. and less drastic measures like transferring Ms. Owens and DEI training. (Id. ¶¶ 18-19; Doc. 33-1, ¶ 25.) Because of D.J.Q. Jr's experience, he no longer felt safe and asked to attend another school. (Doc. 33-2, ¶ 22.) On April 2, 2021, Ms. Quinn

10

requested D.J.Q., Jr. be able to attend Greenbrier, and this request was later approved by Defendant. (Id. ¶ 23.) Because of the incident, Ms. Quinn enrolled D.J.Q., Jr. in counseling services, which he attended for several months. (Id. ¶ 24.)

Ms. Quinn did not follow D.J.Q., Jr. around between classes at Parkway, and she did not interfere with the learning environment at Parkway. (Id. ¶ 26.) Rather, she continued to complete her assigned job duties until she was reassigned from Parkway. (Id.) After Ms. Quinn complained of racial discrimination, she was alleged to have been "disruptive" to the learning environment. (Id. ¶ 27.) Following her reports, Ms. Quinn was not only removed from Parkway for the rest of the school year, but she was also transferred to work in another school district the following school year. (Id. ¶¶ 28-29.)

MFLCs are allowed to work within their assigned schools only with the permission and consent of the local school district. (Id. ¶ 4.) While MFLCs remain employees of Magellan, they are evaluated twice per year by local school district employees, typically the principals of the assigned schools. (Id. ¶ 5.) MFLCs serve the schools they are assigned to for the academic term, and, if there is no request from the school or the MFLC, they will remain in their assigned school. (Id. ¶¶ 6-7.)

At the time of Ms. Quinn's assignment to Parkway, her son, D.J.Q., Jr, enrolled at Parkway as a Kindergarten student. (Id.

¶ 8.)  Prior to reporting racial discrimination in January 2021, Ms. Quinn had no knowledge of Magellan's purported policy prohibiting MFLCs from working at the same school their child attends as Magellan's written conflict of interest policy does not explicitly prohibit such conduct. (Id. ¶ 9.)  When Ms. Quinn was hired by Magellan in 2015, she was not asked where her son attended school nor presented with any conflict-of-interest paperwork to disclose where her son attended school. (Id. ¶¶ 10-11.)

## II. LEGAL STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must "draw all justifiable inferences in h[er] favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citation and internal quotation marks omitted).  The Court should not weigh the evidence or determine credibility. Anderson, 477 U.S. at 255.

The moving party has the initial burden of showing the Court,

by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case, or by showing there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex, 477 U.S. 317). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movants have met their initial burden of showing there are no genuine issues of material fact and they are entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. Id. If the movant presents

13

evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17 (citation omitted). The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk of Court provided Plaintiffs notice of the motion for summary judgment, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 31.) For that reason, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985), have been satisfied. The time for filing materials in opposition has expired, the issues have been thoroughly briefed, and the motion is now ripe for consideration.

### III. DISCUSSION

Defendant moves for summary judgment on all counts asserting the following: (1) Plaintiffs have failed to establish direct evidence of racial discrimination; (2) Plaintiffs have failed to establish direct evidence of racial discrimination via either McDonnell Douglas's burden-shifting framework or Title IX's deliberate indifference standard; and (3) Plaintiffs failed to establish a genuine issue of material fact regarding their retaliation claim. (Doc. 30-1, at 11-25.) The Court addresses Defendant's arguments below.

### A. Discrimination Claim

Ms. Quinn brings a claim on behalf of D.J.Q., Jr. for racial discrimination in contravention of Title VI based on the actions of Defendant following Ms. Owens's interaction with D.J.Q., Jr on January 19, 2021. (Doc. 1, ¶¶ 64-75.) Title VI provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. To establish a Title VI violation, "a plaintiff must show that a challenged action was the result of intentional discrimination on the part of the defendant." Sirpal v. Univ. of Miami, 509 F. App'x 924, 926 (11th Cir. 2013) (citations omitted). Indeed, Title VI prohibits only intentional discrimination.

15

Alexander v. Sandoval, 532 U.S. 275, 280 (2001). To prove the challenged action was the result of intentional discrimination, "[t]he plaintiff may use direct evidence or, in the absence of direct evidence, circumstantial evidence that satisfies the McDonnell Douglas[ v. Green, 411 U.S. 792 (1972)] burden-shifting framework." Sirpal, 509 F. App'x at 926 (citations omitted).

Plaintiffs contend there is a genuine issue of material fact regarding Defendant's discriminatory intent. (Doc. 33-3, at 5-7.) Plaintiffs point to the undisputed facts that Ms. Owens, a white employee of Defendant, shoved a spoon into D.J.Q., Jr.'s, a black student's, mouth when he requested an eating utensil and that Ms. Owens made two prior allegedly derogatory comments against minority communities. (Id. at 6.) Plaintiffs also rely on the difference in treatment between Ms. Quinn and Ms. Owens by Defendant to show Defendant's discriminatory intent. (Id.) Plaintiffs argue "Defendant's refusal to protect [D.J.Q.,] Jr. following complaints of racial discrimination, refusal to implement distance procedures, or provide any discipline whatsoever to Ms. Owens demonstrates that Defendant intended to discriminate against [D.J.Q.,] Jr. because of his identity as a black boy." (Id. at 7.)

Defendant contends the alleged discriminatory remarks made by Ms. Owens are not evidence of racial animus and are unrelated to the incident that occurred with D.J.Q., Jr. (Doc. 30-1, at 12.)

16

Defendant also argues Ms. Owens's actions and remarks were not made by the ultimate decisionmaker as to any alleged adverse action suffered by 'Plaintiffs. (Id.) For these reasons, Defendant asserts Plaintiffs have not shown direct evidence of discriminatory intent. (Id.) As to the burden shifting framework, Defendant does not dispute Plaintiffs are members of a protected class or qualified for the benefit at issue but argues Plaintiffs were not denied any benefit and did not suffer any adverse action. (Id. at 13.) Moreover, Defendant argues Plaintiffs have not shown a similarly situated individual outside the protected class was treated more favorably. (Id. at 13-14, 18-20.)

Direct evidence of discriminatory intent is evidence that establishes the existence of discriminatory intent without any inference or presumption. Sirpal, 509 F. App'x. at 926. "[R]emarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." Id. (citation omitted). To constitute direct evidence, those remarks must not merely suggest a discriminatory motive but be so blatant that the intent could mean nothing other than a motive to discriminate. Akouri v. State of Fla. Dep't of Transp., 408 F.3d 1338, 1347 (11th Cir. 2005) (holding in the employment context, "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination.

17

If the alleged statement suggests, but does not prove, a discriminatory motive, then it is considered circumstantial evidence." (internal quotation marks and citations omitted)).

The Court agrees there is no direct evidence of discriminatory intent by Defendant toward D.J.Q., Jr. Ms. Owens's actions toward D.J.Q., Jr. on January 19, 2021, while inappropriate, do not demonstrate clear racial animus. Her two unrelated prior comments also do not establish her actions on January 19, 2021 were motivated by racial animus. See Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1291-92 (11th Cir. 1998) (finding that "isolated general racial remark[s]," though sometimes circumstantial evidence, are not direct evidence of discrimination when they are either too remote in time or too attenuated and not directed at the plaintiff). Even considering Plaintiffs' allegation that Ms. Owens stated "clean this spoon" as she placed it in D.J.Q., Jr.'s mouth, the Court does not find these actions suggestive of discriminatory motive on behalf of Ms. Owens, much less Defendant. Even if this comment were somehow construed as racial, the comment was ambiguous and not uttered in the context of a decision-making process or even by a decision-maker at all. Thus, Ms. Owens's action on January 19, 2021 and her contemporaneous and prior comments are not direct evidence of discriminatory intent nor are they sufficient circumstantial evidence of bias to provide a reasonable basis for finding discriminatory intent on behalf of

18

Defendant. See Sirpal, 509 F. App'x. at 926. Furthermore, it is undisputed that Ms. Quinn has no specific recollections of Ms. Owens interacting with any other child in the lunchroom other than the incident involving her son D.J.Q., Jr.; Ms. Quinn has not witnessed Ms. Owens interact with a student of a different race (or any race) in response to a request for an eating utensil; and Dr. Doolittle never received any other complaints of discrimination against Ms. Owens. (Doc. 30-10, ¶¶ 21-23; Doc. 33-1, ¶¶ 21-23.) Under these circumstances, the Court finds there is no evidence of direct discrimination by Defendant against D.J.Q., Jr.

Turning to whether Defendant's discriminatory intent could be established through "circumstantial evidence," under the framework set out in McDonnell Douglas, the plaintiff bears the initial burden of proving she has satisfied the elements of her prima facie case. 411 U.S. at 802. If the plaintiff establishes a prima facie case, the defendant must offer a legitimate, nondiscriminatory reason for the adverse action, at which point the burden shifts back to the plaintiff to show that the stated reason is a mere pretext for unlawful discrimination. Id. at 802-04.

To establish a prima facie case of racial discrimination pursuant to Title VI, a plaintiff must show (1) he or she is a member of a protected class; (2) he or she was qualified for the position or benefit at issue; (3) he or she did not receive the

position or benefit or suffered an adverse action; and (4) he or she was treated less favorably than a similarly situated individual outside the protected class. See id. at 802; see also Sirpal, 509 F. App'x at 927-28. There is no dispute as to the first two factors. (Doc. 30-1, at 13.) As to the third factor, Plaintiffs allege D.J.Q., Jr. was "denied the benefit of a non-discriminatory learning environment, after Defendant . . . failed to take any steps to protect [him] from further traumatization" and was "denied the benefit of matriculating with his friends and peers . . . when he was forced to change schools because of [Defendant's] failure to intervene." (Doc. 1, ¶¶ 70-71.) The undisputed facts are that after the incident on January 19, 2021, there were two meetings between D.J.Q., Jr.'s parents and administrators for Defendant; Defendant conducted two independent investigations into the incident and found no need for further discipline of Ms. Owens; at the request of Plaintiffs, Defendant directed Ms. Owens to have no further contact with D.J.Q., Jr.; and there were no other negative interactions between Ms. Owens and D.J.Q., Jr. for the rest of the year. (Doc. 30-10, ¶¶ 10-12, 14, 19, 24; Doc. 33-1, ¶¶ 10, 11, 14, 24; Doc. 33-15, at 1; Doc. 30-4, at 11, 41, 54, 82-84.) These facts do not demonstrate that Defendant failed to intervene. While Plaintiffs contend D.J.Q., Jr. needed counseling following the incident with Ms. Owens and requested to move schools, these facts, considering Defendant's undisputed actions, do not establish that

Defendant intentionally discriminated against D.J.Q., Jr. and thereby denied D.J.Q., Jr. the benefits entitled to him under Title VI.

Even if the facts were such that D.J.Q., Jr did not receive the benefits Plaintiffs claim, Plaintiffs' claims would still fail under the fourth prong of the McDonnell Douglas framework — he was treated less favorably than a similarly situated individual outside the protected class. 411 U.S. at 802. The only comparator Plaintiffs provide is Ms. Owens compared to Ms. Quinn. (Doc. 33-3, at 6-7.) However, Plaintiffs' claim of discrimination is not based on actions taken against Ms. Quinn but is based on those taken against D.J.Q., Jr. (Doc. 1, ¶¶ 64-75.) Plaintiffs provide no comparator for D.J.Q., Jr. Rather, it is undisputed that Plaintiffs have no knowledge of Ms. Owens interacting with a student of a different race under similar circumstances. (Doc. 30-10, ¶¶ 21-23; Doc. 33-1, ¶¶ 21-23.) As a result, the Court finds Plaintiffs failed to demonstrate discriminatory intent under McDonnell Douglas.

Plaintiffs contend discriminatory intent may also be established by utilizing the deliberate indifference standard but cite no authority for this contention. (Doc. 33-3, at 5.) Defendant acknowledges the deliberate indifference standard has been utilized in other circuits in the Title VI context. (Doc. 30-1, at 22-24 (citing Bhombal v. Irving Indep. Sch. Dist., 809 F.

App'x 233 (5th Cir. 2020)).   The Eleventh Circuit recently addressed the deliberate indifference standard's applicability in Title VI claims and found it appropriate in analyzing intentional discrimination by a school district for student-on-student race-based harassment.   Adams v. Demopolis City Sch., 80 F.4th 1259, 1273 (11th Cir. 2023).   This case is not based on an allegation of student-on-student harassment.   However, even if the standard applied in this context, Plaintiffs failed to establish Defendant was deliberately indifferent.

In Adams, the Eleventh Circuit applied the same deliberate indifference standard under Title IX to Title VI.   Id. at 1274. Under this standard, a school is deliberately indifferent only where its response, or lack thereof, to discrimination is "'clearly unreasonable' in the light of known circumstances."   Id. at 1270 (citing Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 648 (1999)).   "To act with deliberate indifference, a school district or official 'must know of and disregard an excessive — that is, an extremely great — risk to the victim's health or safety."   Id. (citation omitted).   "A school district is not deliberately indifferent simply because the measures it takes to stop the harassment or discrimination ultimately are ineffective."   Id. (citations omitted).   "Rather, to rise to the level of deliberate indifference, the response to the harassment or discrimination must amount to 'an official decision . . . not

to remedy the violation.'" Id. (quoting Gebser v. Lago Vista
Indep. Sch. Dist., 524 U.S. 274, 290 (1998) (alteration in
original)). "Deliberate indifference is an exacting standard;
neither negligence nor mere unreasonableness is enough." Id.
(citation omitted).

As discussed, the undisputed facts of the incident on January
19, 2021 do not establish discriminatory intent on behalf of Ms.
Owens or Defendant. But, even if Ms. Owens's actions and previous
comments were enough to demonstrate discriminatory intent,
Plaintiffs failed to show Defendant's response, or lack thereof,
was deliberately indifferent.

Plaintiffs contend that "[i]n lieu of instituting any
corrective action against Ms. Owens, Defendant[] repeatedly
minimized [Plaintiffs'] complaints of discrimination — telling
[them] that no further action was warranted." (Doc. 33-3, at 2-
3.) It is undisputed, however, that after the incident on January
19, 2021, Defendant conducted multiple meetings and investigations
into the matter and implemented Ms. Quinn's requests to limit Ms.
Owens from having any further contact with D.J.Q., Jr. (Doc. 30-
10, ¶¶ 10-12, 14, 19, 24; Doc. 33-1, ¶¶ 10, 11, 14, 24; Doc. 33-
15, at 1; Doc. 30-4, at 11, 41, 54, 82-84.) This response by
Defendant was not "clearly unreasonable." Adams, 80 F.4th at 1270.
While Plaintiffs contend D.J.Q., Jr. was continually traumatized
during his remaining time at Parkway, as explained above just

because the measures taken by a school district are ineffective does not establish that the school district was deliberately indifferent. See id. Indeed, the facts demonstrate Defendant's measures were effective at stopping negative contact between Plaintiffs and Ms. Owens. (Doc. 30-10, ¶ 19; Doc. 30-4, at 41, 82-84.) Thus, the Court cannot find D.J.Q., Jr.'s "continued traumatization" was caused by Defendant's deliberate indifference to racism.

For these reasons, Plaintiffs cannot establish a dispute of fact as to whether Defendant intentionally discriminated against D.J.Q., Jr. Because discriminatory intent is an essential element of their Title VI discrimination claim, the Court finds summary judgment is appropriate, and Defendant's motion is **GRANTED** as to this claim. Sirpal, 509 F. App'x at 926; Alexander, 532 U.S. at 280.

## B. Retaliation Claims

Plaintiffs also bring a retaliation claim under Title VI. (Doc. 1, ¶¶ 76-87.) The regulations to Title VI state in part that:

> No recipient *or other person* shall intimidate, threaten, coerce, or discriminate against any person for the purpose of interfering with any right or privilege secured by title VI of the Act or this Part 1, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this part.

24 C.F.R. § 1.7(e) (emphasis added). Title VI, while containing sweeping prohibitions against race discrimination, restricted the breadth of actions available, particularly in the context of discrimination in employment. _Jones v. Metro. Atlanta Rapid Transit Auth._, 681 F.2d 1376, 1378 (11th Cir. 1982). The statute provides:

> Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.

42 U.S.C. §2000d-3. While Title VI is related to Title VII and often analyzed under similar frameworks, as the Supreme Court explained in _Consolidated Rail Corp. v. Darrone_, 465 U.S. 624 (1984), it is "unnecessary to extend Title VI more generally to ban employment discrimination, as Title VII comprehensively regulates such discrimination." _Id._ at 632 n.13. Thus, to bring suit under Title VI for discriminatory employment practice, the "primary objective of the Federal financial assistance" received by the defendant must be providing employment. _Jones_, 681 F.2d at 1378 n.5 (quoting 42 U.S.C. §2000d-3). This limitation applies to private actions to the extent they are implied under the statute. _Consol. Rail_, 465 U.S. at 635 (1984) (explaining that Section 604 must be viewed as "a drastic limitation on the . . . _individual's_ right to sue federal grant recipients for employment

discrimination" (emphasis added)); <u>Scott v. Underground Festival Inc.</u>, No. 1:97-CV-610, 1998 WL 657771, at *11 (N.D. Ga. July 9, 1998) (citations omitted).

Based on the foregoing, Plaintiffs have no standing to assert any claims under Title VI for the allegedly adverse employment actions taken by Defendant. While it is undisputed that Ms. Quinn is not employed by Defendant, Plaintiffs' retaliation claim is based on the adverse employment action allegedly taken against Ms. Quinn at Defendant's directive. (Doc. 1, ¶¶ 76-87; Doc. 30-10, ¶¶ 51-52; Doc. 33-1, ¶¶ 51-52.) Even if Plaintiffs could establish retaliation occurred, Plaintiffs have failed to point to any evidence showing the primary purpose of the federal funding Defendant received was to provide employment. <u>Scott</u>, 1998 WL 657771, at *10-11 (finding plaintiff had no standing to assert any Title VI claims, including one for retaliation, when she failed to show the primary objective of the federal assistance program was to provide employment); <u>Mawulawde v. Bd. of Regents of Univ. Sys. of Ga.</u>, No. CV 105-099, 2009 WL 10678751, at *17 (S.D. Ga. Mar. 27, 2009), <u>aff'd</u>, 372 F. App'x 51 (11th Cir. 2010) (finding plaintiff's Title VI discrimination claims failed as a matter of law when he failed to point to any evidence showing the defendant received federal funding or the primary purpose of the funding was to provide employment). Therefore, Plaintiffs' Title VI claim

fails as a matter of law, and Defendant's motion is **GRANTED** as to this claim.

### IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Doc. 30) is **GRANTED**. The Clerk is **DIRECTED** to **ENTER JUDGMENT** in favor of Defendant, **TERMINATE** all other pending motions and deadlines, if any, and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this _12th_ day of March, 2024.

_____
J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA